USCA1 Opinion

 

 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 96-1551 CANDACE A. QUINN, Petitioner, v. DAVID R. HINSON, Administrator, FEDERAL AVIATION ADMINISTRATION, Respondent. ____________________ ON PETITION FOR REVIEW OF AN ORDER OF THE NATIONAL TRANSPORTATION SAFETY BOARD ____________________ Before Boudin, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Thomas C. Halloran on brief for petitioner. __________________ Robert P. Vente and Kathleen Yodice, Acting Manager, Appellate ________________ _______________ Branch, Office of the Chief Counsel, Federal Aviation Administration, on brief for respondent. ____________________ December 19, 1996 ____________________ ALDRICH, Senior Circuit Judge. Candace A. Quinn _____________________ (hereinafter petitioner), seeks review of the National Transportation Safety Board's affirmance of an order of the Federal Aviation Administration ("FAA"), suspending her commercial pilot's license for forty-five days. We affirm. I. Background __________ A. Facts _____ Petitioner is a certified flight instructor employed by a fixed base operator at the Beverly, Massachusetts airport. In addition to flight instruction duties, she flies a daily morning Metro Traffic Reporting flight. On the day in question, she performed her regular traffic flight. Later that morning, her employer asked her to make a ferry flight to Lawrence, Massachusetts, approximately twelve miles northwest, in a plane she had never operated. Petitioner did not hesitate because she was "just used to going up [t]here and not having any problems . . . ." Shortly after her departure from Beverly, petitioner contacted Lawrence Automatic Terminal Information Service ("ATIS") and was informed that the weather was suitable for flying under Visual Flight Rules ("VFR").1 A  ____________________ 1. Visual Flight Rules, see 14 C.F.R. 91.151-159, govern ___ procedures for flight in "VFR" conditions. In general, VFR conditions are those where the pilot can see minimum required distances and utilize visual navigation techniques. -2- few minutes later, she tried to contact Lawrence Air Traffic Control ("ATC") and found both radios inoperative. At about the same time, she noticed snow showers to the north in the direction of Lawrence airport. Unable to make contact with Lawrence ATC she ultimately turned away from the weather. It appears that at this point petitioner had lost track of where she was. Instead of heading back toward Beverly, she testified that she "didn't know the exact heading [she] took but it must have been a heading of south . . . ." While on this southerly heading, she steadily descended, watched for traffic, worked on her radios and tried to "calm" herself. Petitioner eventually managed to establish radio contact with Lawrence ATC and was "shocked" to learn she was twenty miles south of her intended flight path -- at an elevation of only 700 feet, three miles north of Logan Airport -- thus flying in Class B controlled airspace2 without authorization. At the urgent request of a Logan air traffic controller, Lawrence ATC radioed petitioner to contact Logan ATC which then provided her with vectors back to Lawrence. As a result of this unauthorized foray into Class B air space, Logan controllers were forced to shut down  ____________________ 2. Class B controlled airspace surrounds the nation's busiest airports. It generally ranges from the surface to altitudes as high as 10,000 feet and requires Air Traffic Control clearance before entry. -3- runways, delay departing flights and divert arriving flights on final approach. The written record does not reflect that petitioner ever informed Lawrence ATC or Logan controllers of her radio problems.3 After landing at Lawrence, petitioner contacted the Boston Terminal Radar Approach Control ("TRACON") Area Manager. When asked what happened, she replied: I got kind of discombobulated because I entered a snow shower and none of my radios seemed to be working. I was getting wrong information . . . I ran into a little bit of difficulty . . . I got disoriented. I have an instrument rating . . . [b]ut I'm not current . . . I'm actually a certified flight instructor and this is the scary part . . . I just . . . got disoriented and I guess I thought I knew where I was going and then when I found out that I didn't have the runway or airport in sight then I knew I had a problem . . . if anyone had told me it would happen to me I would never [have] believed it . . . I'm probably going to be in very big trouble. Three weeks later, petitioner submitted a written report to the Logan FAA Flight Standards Field Office in which she acknowledged that "perhaps [she] could have done more to prevent incurring Boston's airspace." With the burden being on her, this was an understatement.  ____________________ 3. Petitioner did testify that after making contact with Lawrence Air Traffic Control, she reported her radio problems. She also testified that she told Logan controllers of her avionics difficulties. However, neither transcript of tapes routinely kept by both authorities contained any confirmation of this. -4- B. Procedural History __________________ On March 29, 1994, the FAA issued the final amended order suspending petitioner's commercial pilot certificate. The order found petitioner guilty of three violations of Federal Aviation Regulations ("FAR"), 14 C.F.R. 1.1 et __ seq. Specifically, she was charged with operating her ____ aircraft within Class B airspace without authorization, see ___ 14 C.F.R. 91.131(a)(1), and over a congested area of a city below an altitude of 1,000 feet. See 14 C.F.R. 91.119(b). ___ She was also charged with operating her aircraft carelessly or recklessly so as to endanger the life or property of another. See 14 C.F.R. 91.13(a). ___ Petitioner filed a notice of appeal with the National Transportation Safety Board ("NTSB"), pursuant to 49 C.F.R. Part 821, Subpart I. A hearing was held on August 29, 1995, before an Administrative Law Judge ("ALJ"), who affirmed the FAA order in its entirety. Petitioner then filed a notice of appeal with the full NTSB which denied the appeal and upheld the ALJ's decision. We have jurisdiction under 49 U.S.C. 1153. II. Discussion __________ Under the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2)(A), we are required to give NTSB decisions "generous deference on review," Echo, Inc. v. Hinson, 48 F.3d __________ ______ 8, 11 (1st Cir. 1995), affirming unless the decision was -5- "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Id. (citation omitted). We ___ accept factual conclusions by the NTSB if they are supported by substantial evidence, Twomey v. Nat'l Transp. Safety Bd., ______ ________________________ 821 F.2d 63, 67 n.5 (1st Cir. 1987); 49 U.S.C. 1153(b)(3), while reviewing questions of law de novo. Petitioner does not dispute that she committed multiple FAR violations, maintaining, instead, that she was excused from compliance under 14 C.F.R. 91.3(b), which provides that "[i]n an in flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency." The NTSB and the ALJ considered this affirmative defense and rejected its application because the emergency was of petitioner's own making. We agree. See, e.g., ___ ____ Chritton v. Nat'l Transp. Safety Bd., 888 F.2d 854, 861 (D.C. ________ ________________________ Cir. 1989) (emergency defense rejected where pilot encountered deteriorating weather conditions and failed to execute a 180 degree turn). It is beyond dispute that upon encountering snow showers in her path, petitioner could simply have turned around and returned to Beverly airport. Instead, she panicked and blundered into classified airspace, endangering many lives, including her own. Petitioner contends that contrary to the requirements of the APA, the ALJ's decision did not contain a -6- "recitation of factual evidence" nor "an analysis thereof to support the ultimate findings of fact which support the conclusions of law." See 5 U.S.C. 557(c). The ALJ, ___ however, specifically found that petitioner was "confused and disoriented" and stated: [I]f there was an emergency -- Respondent's counsel says there was an emergency -- it was an emergency of her own making and she certainly didn't tell anyone during, before or afterwards that such an emergency existed . . . I do not find there was an emergency, really, as such on the part of the pilot. While this passage is not included in the ALJ's formal recitation of findings of fact and conclusions of law, we find it to be adequately articulated and providing sufficient support for the rejection of the emergency defense. Petitioner also maintains that the findings of material fact by the ALJ and upheld by the NTSB are not supported by substantial evidence as required under 5 U.S.C. 706(2)(E). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Chritton, 888 F.2d at 856 (citations omitted). ________ Under the substantial evidence test, we "determine whether the agency . . . could fairly and reasonably find the facts as it did." Id. (citations omitted). "An agency conclusion ___ may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would -7- support a contrary view." Throckmorton v. Nat'l Transp. ____________ ______________ SafetyBd., 963F.2d 441,444 (D.C.Cir. 1992)(citation omitted). _________ After a close review of the record, we hold that the findings of the ALJ are supported by substantial evidence. First, as regards the rejection of the emergency defense, there was testimony by an FAA expert which established that petitioner should not have attempted to fix her radios if doing so would result in a loss of ground reference points. Radios are not required for aircraft flying in VFR conditions during the day. See 14 C.F.R. ___ 91.205(b). Moreover, the expert witness testified that even if petitioner had lost sight of her ground reference points and therefore could not engage in "dead reckoning,"4 she still had use of her magnetic compass or her directional gyroscope which would have alerted her that she was turning south toward Logan. Substantial evidence supports the threshold of findings of FAR violations. Petitioner in her testimony admitted her ultimate conclusion that she "was probably headed south while . . . trying to fix the radio," that she was "probably" within three miles of Logan when contact was made and that she "kept descending thinking it was going to get better." She should have known immediately. Although  ____________________ 4. "Dead reckoning" is a basic navigational method using compass, time, distance and headings. -8- she couldn't remember going as low as 700 feet, the FAA introduced a radar plot confirming the low altitude. We need go no further. The decision of the NTSB is affirmed. -9-